UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA

    - against -                                    **MEMORANDUM AND ORDER**
                                                24-CR-1(KAM)
RAY BRITO,

              *Defendant.*
----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

         On December 1, 2023, Ray Brito was arraigned on a criminal complaint alleging that he had robbed two banks in Queens, New York. (ECF No. 1 ("Crim. Compl.").) On January 2, 2024, a grand jury indicted Mr. Brito on two counts of bank robbery in violation of 18 U.S.C. § 2113(a) based on the same allegations. (ECF No. 9 ("Indictment").)

         Before the Court are Mr. Brito's motion to suppress evidence obtained on the date of his arrest and evidence subsequently obtained in the search of his apartment (ECF No. 33 ("Motion" or "Mot.")), Mr. Brito's affidavit in support of his motion (ECF No. 34-1 ("Brito Affidavit" or "Brito Aff.")), the government's December 16, 2024 and January 16, 2025 responses (ECF Nos. 35 & 39 ("Opposition" or "Opp.")), Mr. Brito's reply (ECF No. 42 ("Reply")), the government's surresponse (ECF No. 43 ("Surresp.")) and supplemental submission (*see* ECF No. 44), and oral argument on the motion (Jan. 10, 2025 Tr.). For the reasons set forth below, Mr. Brito's motion is respectfully denied.

## BACKGROUND[1]

### A.    June 14, 2023 Citibank Robbery

On June 14, 2023, at approximately 2:45 p.m., a masked man robbed a Citibank bank located on Steinway Street in Astoria, Queens. (Crim. Compl. ¶ 2; Opp. at 2.) The robber pushed a hard object, which he stated was a firearm, into the Citibank manager's back. (Crim. Compl. ¶ 2.) The robber then directed the manager to tell two bank tellers to give the robber $10,000 each. (*Id.*) The robber counted the money ($20,000 in total) and fled. (*Id.*) Surveillance camera footage shows that the robber was carrying a dark backpack with no identifiable logos, was wearing a white medical-style facemask, a dark baseball cap with an indiscernible image located on the front-center of the cap, a dark jacket, dark shoes, and white or light gray, loose-fitting pants. (Opp. Ex. ("GX") 2 (video footage of Citibank Robbery) at 04:30.[2]) Shortly

---

[1] Unless otherwise indicated, the facts pertinent to the motion are undisputed and are drawn from allegations in the criminal complaint dated December 1, 2023, the parties' submissions on Mr. Brito's motion, submitted video camera footage, and concessions by counsel. (*See* Mot. at 1–2 (relying on allegations in criminal complaint)); *United States v. Poller*, 129 F.4th 169, 172 n.1 (2d Cir. 2025) (relying on facts "not in dispute" drawn from district court's decision and appendices filed on appeal, which included officers' body-camera footage, to review denial of suppression motion); *see also United States v. Poller*, 682 F. Supp. 3d 226, 232 n.22 (D. Conn. 2023) (finding evidentiary hearing on suppression motion unnecessary based on counsel's stipulations, concessions, and the absence of factual disputes).

[2] All pinpoint citations in the form of "at XX:XX" indicate times within a cited video file, rather than times of day superimposed on certain video footage.

after leaving the bank, as captured on surveillance footage from outside the bank, the robber changed from a black jacket into a blue, long-sleeved shirt, removed sweatpants to reveal jeans underneath, changed a dark baseball cap to a blue one, removed his face mask, put on a black balaclava, and fled on a black bicycle with straight handlebars.  (GXs 3-6 (surveillance footage of the robber outside the bank); Crim. Compl. ¶¶ 4-5.)  The robber apparently converted the backpack to a messenger-style bag worn cross-body before fleeing on the bicycle.  (GX 6.)

| During Citibank Robbery[3] | After Citibank Robbery[4] |
|---|---|
|  | |

B.     **September 22, 2023 Santander Robbery**

On September 22, 2023, starting at approximately 3:30 p.m., an individual alleged to be the same robber as in the

---

[3] (*See* GX 2 at 00:40, 04:28, 07:14.)

[4] (*See* GX 6 at 00:09.)

Citibank Robbery, robbed a Santander Bank located on 31st Avenue in Queens. (*Id.* ¶ 6.) The robber displayed a firearm that he had pulled out of his bag and ordered the bank manager to turn over a sum of U.S. currency. (*Id.*) Surveillance footage shows that the robber carried a dark backpack with no identifiable logos, and wore a white medical-style facemask, a dark blue cap with a New York Giants logo over horizontal white stripes on its front center, a dark jacket, dark sweatpants, dark shoes, and white gloves. (*Id.* ¶¶ 8-9; GX 8 (video footage of Santander Bank) at 32:00.)

| During Santander Robbery[5] | After Santander Robbery[6] |
|---|---|
|  | |

Shortly after leaving the bank, as captured on surveillance footage, the robber ducked behind a van, emerged in a red, long-sleeved shirt, jeans, and a white baseball cap, and fled on a black bicycle with straight handlebars. (GX 9.) Surveillance footage shows that the robber wore a watch on his wrist. (*Id.* at 03:30.)

---

[5] (*See* GX 8 at 31:58, 32:23.)

[6] (*See* GX 9 at 01:05, 01:58, 03:30, 03:55.)

C.    **November 30, 2023 Arrest and Backpack Search**

Surveillance video from several different sources was used to follow the robber from the Santander Bank to the residential block of 104th Street in Queens between 38th Avenue and 39th Avenue, which he is seen entering but not exiting.  (*Id.* ¶ 12.)  Existing security cameras on the block observed the entrances to all but two residences, but the footage captured by those cameras did not depict the robber entering any residence. (*Id.* ¶ 13.)  Officers then placed a pole camera to observe the two entrances of residences previously not observed on video, one of which was located at 38-11 104th Street.  (*Id.* ¶ 14; Opp. at 7.)

**Mr. Brito Exiting 38-11 104th Street on November 30, 2023[7]**



---

[7] (*See* GX 10 at 00:47, 00:56.)

At approximately 10:15 a.m. on November 30, 2023, an individual, later identified as Mr. Brito, left 38-11 104th Street on "a black bicycle matching the black bicycle used by the suspect in each robbery" and wearing shoes, a backpack, and a watch that were similar to the robber's shoes, backpack, and watch captured on surveillance footage. (Crim. Compl. ¶ 15.) Mr. Brito matched the general build of the robbery suspect. (*Id.* ¶ 16.) The November 20, 2023 pole camera surveillance footage shows Mr. Brito exiting the house wearing black shoes, white pants, a dark backpack, a dark blue jacket, a red baseball cap with no logos or markings, and a watch, and holding a black bicycle with straight handlebars. (GX 10 at 00:40-1:10.)

Later the same day, at approximately 1:51 p.m., three officers from a joint task force comprised of officers from the Federal Bureau of Investigation ("FBI") and New York City Police Department ("NYPD") (the "Joint Task Force") approached and arrested Mr. Brito in the vicinity of 38-11 104th Street. (Crim. Compl. ¶ 17; Opp. at 7; GX 15 at 00:17-:25.) Arresting officers searched Mr. Brito's person and backpack at the time of his arrest and recovered an airsoft pistol resembling a semiautomatic firearm, a police scanner, a white medical mask and black balaclava, a second baseball cap and jacket, and a watch similar to the one worn by the robber. (Opp. at 7-8; GX 11; GX 15 at

6

00:20–2:02.)  As they searched Mr. Brito's person, officers pulled down Mr. Brito's outer layer of pants to reveal a lower layer of "jean-patterned thermal underpants."  (Brito Aff. ¶ 4; GX 15 at 01:57.)[8]  Before they began searching Mr. Brito's backpack, three officers restrained Mr. Brito's hands behind his back with handcuffs (*see* GX 15 at 00:40), a fourth officer appeared (*id.* at 01:56), and one officer later escorted Mr. Brito out of view of the camera, "likely [to] a police vehicle," according to defense counsel (Reply at 3; GX 15 at 02:37).  After Mr. Brito was escorted out of view, officers conducted a more thorough search of his backpack.  (GX 15 at 04:00–6:05.)  Thereafter, Mr. Brito was transported to 290 Broadway, New York, New York 10007.  (*See* GX 16 at 1; GX 17 at 1.)

The following day, December 1, 2023, Mr. Brito was arraigned and, having presented no bail application, detained in advance of trial.  (*See* ECF No. 3 (order of detention).)  On

---

[8] The parties offer conflicting descriptions of the layer of clothing that Mr. Brito wore beneath his outer pants at the time of his arrest.  Mr. Brito contends that he was wearing "jean-patterned thermal underpants" beneath his sweatpants. (Brito Aff. ¶ 4.)  The government contends that pole camera footage of Mr. Brito's arrest "confirms that [Mr. Brito] wore jeans beneath his sweatpants." (ECF No. 39 at 2 (citing GX 15 at 01:20–2:12).)

As will be discussed below, the Court assumes the truth of Mr. Brito's contention that he was wearing "jean-patterned thermal underpants" at the time of his arrest.  This assumption has no effect on the Court's analysis of whether officers had probable cause to arrest Mr. Brito.

December 19, 2023, Mr. Brito was released on a $75,000 bond.  (*See* ECF No. 7 (conditions of release).)

On December 4, 2023 and December 5, 2023, while Mr. Brito was in pretrial detention, FBI Special Agent David Sferrazza and NYPD Detective Raymond McCann conducted inventory searches of Mr. Brito's backpack and vouchered its contents.  (*See* GX 16 at 1; GX 17 at 1.)  These inventory searches recorded the same items that officers had found at the time of Mr. Brito's arrest, as well as several additional items.  (*See* GX 16 (FBI inventory of items seized from Mr. Brito titled "collected item log" dated December 4, 2023, including "1 Black backpack-logos taped up," "1 Glock . . . airsoft gun," black jacket, belt, gloves, watch, police scanner, balaclava face mask, blue jacket, medical masks, gray and white baseball cap with blue New York Giants logo, keys, and bicycle); GX 17 (FBI addendum to items seized from Mr. Brito dated December 5, 2023, including red baseball cap).)  The government has submitted a "copy of Sections 19.7.3 and 18.6.12.4.1.D of the FBI's Domestic Investigation and Operations Guide," provided by a member of the Joint Task Force.  (ECF No. 44; GX 21 (the "Joint Task Force Inventory Search Policy").)  The government represents that the Joint Task Force Inventory Search Policy was in effect between November 30, 2023, when Mr. Brito was arrested, and December 5, 2023, when FBI Special Agent David

Sferrazza and NYPD Detective Raymond McCann conducted their second inventory search of Mr. Brito's backpack.  (*See* ECF No. 44.)

In Mr. Brito's affidavit in support of his motion, he states that upon his arrest he was "wearing gray sweatpants, black sneakers, and a baseball cap."  (Brito Aff. ¶ 6.)  He further states that his backpack was "dark with a camouflage design, and could not have been readily identified as the one depicted in the surveillance photos in the Complaint, which [he] ha[d] reviewed." (*Id.*)  Thus, Mr. Brito contests the color of the pants he was wearing when he was arrested (arguing that they were gray instead of white), as well as the similarity of his backpack to that of the suspect in the two robberies (agreeing that it was dark but arguing that due to its camouflage design, it could not be mistaken for the backpack used in the Citibank and Santander Robberies). The Court considers the significance of Mr. Brito's contentions concerning his pants and backpack below, in its assessment of whether officers had probable cause to effect Mr. Brito's arrest.

9

**Mr. Brito's November 30, 2023 Arrest[9]**



D.   **December 2023 Apartment Search**

On December 3, 2023, while detained at the Metropolitan Detention Center in Brooklyn, Mr. Brito called his mother, Maria, and sister, asking them to vacate his belongings from his apartment for him.  (Opp. at 8; GX 12.)  On the same day, Mr. Brito's mother and sister visited the apartment in the Bronx, a separate residence from the Queens residence near which he was arrested.  (Opp. at 8.)  On December 6, 2023, Mr. Brito's landlord, Devon Chambers, informed officers that Mr. Brito's family had turned over keys to the apartment and asked that the landlord dispose of anything left behind.  (Opp. at 8; GX 14.)

During a second visit to Mr. Brito's apartment on December 9, 2023 (*see* GX 14 (documenting visits on both December 3, 2023, and on December 9, 2023)), Mr. Brito's mother signed a

---

[9] (*See* GX 15 at 00:08, 01:52, 4:26.)

10

letter stating that she gave Mr. Chambers "permission to vacate all belongings" from the apartment and to "do as needed, to [the landlord's] desire with all ite[ms]." (GX 13.) Mr. Chambers subsequently authorized officers to search the apartment. (Opp. at 8-9.) Upon searching the apartment, officers recovered a "red shirt that closely resembles the one worn by the robber during his flight from the Santander Bank." (Opp. at 9.)

      **E.  Procedural History**

An indictment filed on January 2, 2024 charges Mr. Brito with two counts of bank robbery in violation of 18 U.S.C. § 2113(a) based on his alleged robberies of the Queens Citibank on June 14, 2023 (the "Citibank Robbery") and of the Queens Santander Bank on September 22, 2023 (the "Santander Robbery). (*See* Indictment.) On November 14, 2024, Mr. Brito moved to suppress evidence "includ[ing] his inner pants, his backpack and its contents, and the clothing seized from his apartment" based on his contention that his arrest, the search of his backpack, and the search of his apartment were illegal under the Fourth Amendment. (*See* Mot. at 6.) On November 27, 2024, Mr. Brito filed an affidavit in support of his motion. (*See* Brito Aff.)

The government responded on December 16, 2024, arguing that officers had probable cause to arrest Mr. Brito, that the search of his person and backpack was incidental to his arrest,

and that Mr. Brito had consented to the search of his apartment, which he had also vacated.  (*See generally* Opp.)  The government's opposition included video surveillance of the Citibank and Santander Robberies, among other exhibits.  (GXs 1-14.)  The parties submitted oral argument on January 10, 2025, and thereafter submitted supplemental submissions including additional exhibits and video footage of, among other things, Mr. Brito's November 30, 2023 arrest.  (*See* ECF Nos. 39, 42, 43 & 44; GXs 15-21.)

**LEGAL STANDARDS**

### I.    Motion to Suppress

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV; *accord Maryland v. Pringle*, 540 U.S. 366, 369 (2003).  A defendant who contends that his Fourth Amendment rights were violated by reason of an illegal search or seizure may, by filing a motion to suppress, seek to prohibit the government from using the fruits of such search or seizure in a prosecution against that defendant. *See, e.g.*, *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992); *see also* Fed. R. Crim. P. 12(b)(3)(C), 41(h).

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without

a warrant subjected him to a search or seizure." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996)). "Once the defendant has met this burden, the burden shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *Id.* (citing *Bayless*, 921 F. Supp. at 213; *Arboleda*, 633 F.2d at 989; *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993); *Pena*, 961 F.2d at 338-39). "Here, the parties do not dispute that Defendant was subjected to a custodial arrest . . . without a warrant. The only issue in dispute is whether the warrantless search and seizure violated the Fourth Amendment. Accordingly, the burden rests with the Government." *Id.* (citing *Bayless*, 921 F. Supp. at 213).

II.     **Warrantless Arrest and Probable Cause**

A warrantless arrest is unlawful unless the arresting officer had probable cause to believe a crime had been committed. *Perea*, 986 F.2d at 642-43 (citing *Dunaway v. New York*, 442 U.S. 200, 208 & n.9 (1979)); *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Probable cause to arrest a suspect exists where an officer has knowledge of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief

that an offense has been or is being committed by the person to be
arrested.  *See United States v. Diaz*, 854 F.3d 197, 203 (2d Cir.
2017) (citing *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d
Cir. 2010)); *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007).

To assess whether probable cause exists, courts look to
the facts known by the arresting officer at the time of the arrest.
*Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013)
(citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Jaegly
v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)).  This standard is a
"practical" one that analyzes the "factual and practical
considerations of everyday life on which reasonable and prudent
men, not legal technicians, act." *Pringle*, 540 U.S. at 370.  "An
officer's assessment in this regard need not be perfect because
'the Fourth Amendment allows for some mistakes on the part of
government officials,'" *Diaz*, 854 F.3d at 203 (internal quotation
marks omitted) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60-
61 (2014); *citing Herring v. United States*, 555 U.S. 135, 139
(2009)), and may be based on the collective knowledge of officers
involved in an investigation so long as the officers were in
communication with each other, *see United States v. Cruz*, 834 F.2d
47, 51 (2d Cir. 1987) (citing *United States v. Tussa*, 816 F.2d 58,
63 (2d Cir. 1987)).  The probable cause standard is fluid and
contextual, so a court must examine the totality of the

circumstances of a given arrest from the perspective of a reasonable police officer in light of his training and experience. *Delossantos*, 536 F.3d at 159 (citations omitted); *see also Walczyk*, 496 F.3d at 156 ("probable cause is 'a fluid concept not readily, or even usefully, reduced to a neat set of logical rules.'" (alteration adopted; citation omitted; quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983))).

Probable cause does not exist that a particular person committed a given crime if officers merely possessed information about the perpetrator that could apply to broad array of persons beyond the arrestee. *See United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citing *Wong Sun v. United States*, 371 U.S. 471, 481 (1963); *United States v. Rosario*, 543 F.2d 6, 8 (2d Cir. 1976); *United States v. Jackson*, 652 F.2d 244, 247–48 (2d Cir. 1981)); *see also United States v. Viscioso*, 711 F. Supp. 740, 749 (S.D.N.Y. 1989) (concluding arresting officers had probable cause to believe arrestees committed drug offense because undercover officers provided descriptions of arrestees, surveillance photographs confirmed the provided descriptions, and undercover officers identified arrestees shortly after drug transactions).

**III.    Pertinent Warrantless Search Exceptions**

When conducting a lawful arrest, officers may search "the arrestee's person and area within his 'immediate control'"

without a warrant. *Perea*, 986 F.2d at 643 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). This rule, known as the search-incident-to-arrest doctrine, is limited to the arrestee's person and area within his immediate control, but other related doctrines, such as inevitable discovery, *see Murray v. United States*, 487 U.S. 533, 539 (1988), and inventory searches, *see Illinois v. Lafayette*, 462 U.S. 640, 644 (1983); *Colorado v. Bertine*, 479 U.S. 367, 375-76 (1987), may combine to admit the results of a search even if such a search was not incidental to a defendant's arrest. *See, e.g.*, *United States v. Morillo*, No. 08-cr-676(NGG), 2009 WL 3254431, at *7-11 (E.D.N.Y. Oct. 9, 2009) (finding special exigencies, inevitable discovery, and inventory search doctrines operated to admit contents of searched backpack).

## IV.    Suppression Hearing

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (quoting *Pena*, 961 F.2d at 339). But if the facts asserted by a defendant, even if credited, "fail[] to show that he could challenge the search under the Fourth Amendment," then no hearing is required. *Id.*

16

**DISCUSSION**

I.    **Warrantless Arrest**

Based on the surveillance videos of the Citibank and Santander Robberies, there is "no question that the police had probable cause to believe that crimes had been committed." *Viscioso*, 711 F. Supp. at 746. The more difficult question is whether police had probable cause to believe that Mr. Brito is the individual who committed one or both robberies. Based on the parties' submissions, and considering the totality of the circumstances, there was probable cause for officers to believe Mr. Brito had committed both robberies, and therefore officers had probable cause to arrest Mr. Brito on November 30, 2023.

Following the Santander Robbery on September 22, 2023, law enforcement used surveillance camera footage to track the robber, who fled on a black bicycle with straight handlebars and no visible branding, from the Santander Bank to a single residential block. After entering the block, the robber was not seen exiting the block on surveillance footage. Security cameras on the block observed the entrances to all but two of the residences on that block, and law enforcement subsequently placed a pole camera to capture footage of those two residences, each of which was a single-family residence. Several weeks after the Santander Robbery, on November 30, 2023, Mr. Brito exited 38-11

17

104th Street, one of the two residences observed by the new pole camera.  He was carrying a black bicycle with straight handlebars and no visible branding, he matched the general build of the robber, he carried a dark backpack closely resembling the one used by the robber, and he wore a watch on his left wrist.  These facts, considered together, established probable cause to arrest Mr. Brito when he returned to 38-11 104th Street later that day.

To be sure, the facts known to arresting officers, when considered individually and in isolation, are innocuous.  Officers knew that Mr. Brito and the robber shared similar physical builds, that they possessed similar backpacks and bicycles, and that Mr. Brito emerged from one of the two single-family residences to which the robber appeared to have had access.  Any of these facts, when considered individually, "could have applied to any of a number of persons," *Fisher*, 702 F.2d at 375, and "would fit a very large group of ordinary young men," *Rosario*, 543 F.2d at 8.  But when considered together, the totality of these facts establishes probable cause to arrest Mr. Brito for the Santander Robbery.

The Second Circuit recently addressed whether officers had probable cause to effect a warrantless arrest of an individual alleged to have committed a crime not directly observed by the arresting officer.  In *United States v. Lefebvre*, 117 F.4th 471, 473 (2d Cir. 2024), police responded to a 911 call from a Holiday

18

Inn employee reporting that a man "wearing a gray sweatshirt and jeans with tattoos on his face had threatened two female guests with a gun" in a stairwell at the hotel. Trooper Sullivan arrived first at the scene and spoke to two women purporting to be victims of the assault. *Id.* Their descriptions of the assailant and of the assault matched the 911 caller's descriptions. *Id.* Sergeants Cushing and Norton then arrived at the hotel, conducted a search of the hotel, and spoke to a third guest, who stated that she had overheard the alleged assault and affirmed that she had seen a man with facial tattoos use the stairwell in question. *Id.* After searching the hotel, Trooper Sullivan drove his patrol car to the rear parking lot of the hotel where he observed a man (later identified as the defendant) leaving the stairwell "wearing a grey hoodie sweatshirt, a blue-colored medical face covering, [who] had several face tattoos visible, and [who] was carrying a backpack over his shoulder(s)." *Id.* The man also jumped or startled after looking toward the police cruiser. *Id.* Trooper Sullivan exited his vehicle, drew his weapon, ordered the defendant to stop, and conducted a pat-down search. *Id.* Trooper Sullivan then handcuffed the defendant, who denied permission to search his backpack, before driving him to police barracks where he was identified by witnesses as the man who had threatened them with a gun earlier that day. *Id.* at 473-74. Trooper Sullivan obtained a warrant to search the

19

backpack, in which he found a handgun, .40 caliber cartridges, 220 bags of fentanyl, and a bag of marijuana. *Id.* at 474. The district court denied the defendant's motion to suppress physical evidence seized from the backpack. *Id.*

The Second Circuit affirmed. After first analyzing the legality of the seizure as an investigative detention, *id.* at 474-76, the Second Circuit then considered whether the detention, if it graduated to an arrest, was supported by probable cause, *id.* at 476-77. The Second Circuit found that Trooper Sullivan had probable cause to arrest the defendant where he relied on his conversation with three hotel employees, his conversation with the two complaining witnesses, his observation of the defendant leaving the stairwell where the incident occurred, the defendant's startled reaction upon seeing the police car, and the 911 call. *Id.* at 476. The Second Circuit found it important that the two complaining witnesses and the third hotel guest provided similar descriptions of the defendant and confirmed that the incident occurred in the particular stairwell that Trooper Sullivan observed the defendant leaving. *Id.* Differences between witness descriptions of the assailant and the defendant's appearance—for instance, the difference between the description of the assailant wearing a "grey sweatshirt" and the defendant wearing a "grey hoodie sweatshirt"—were "trivial." *Id.* at 476-77.

In contrast, the Second Circuit noted that an FBI tip that Trooper Sullivan had received several days before the 911 call, describing a 5'5" Hispanic male weighing approximately 130 pounds from the Massachusetts area in possession of a firearm was "vague and 'would fit a very large group of ordinary young men,'" entitling it to "little to no value" in the court's probable cause analysis. *Id.* (citing *Rosario*, 543 F.2d at 8).

Thus, in *Lefebvre*, the Second Circuit held that an officer who learned from witness interviews that a man wearing a gray sweatshirt and jeans with tattoos on his face had threatened victims with a gun in a hotel stairwell had probable cause to arrest an individual who emerged from the same stairwell wearing a gray hoodie sweatshirt, a blue-colored medical face covering, and with several visible face tattoos, which individual was also carrying a backpack over his shoulder. *See Lefebvre*, 117 F.4th at 473-74, 476-77. Here, arresting officers learned from copious surveillance footage that a bank robber rode a black bicycle with straight handlebars, wore light colored pants over other pants during the robbery, had a dark backpack, and had likely entered one of two single-family residences on a residential block in Queens that had been under pole camera surveillance since the

Santander Robbery.[10]  The combination of these facts gave arresting officers probable cause to arrest Mr. Brito as he emerged from, or apparently returned to, one of the two residences wearing light colored pants and a dark backpack, walking a black bicycle with straight handlebars.[11]

Mr. Brito contends that certain inconsistencies between the surveillance footage and Mr. Brito's actual appearance compel a conclusion that officers lacked probable cause to arrest him, but these alleged inconsistencies are "trivial and easily reconcilable." *Lefebvre*, 117 F.4th at 476. The surveillance footage shows Mr. Brito wearing white or light colored pants, and Mr. Brito alleges that he was wearing gray sweatpants at the time of his arrest. The distinction is trivial. The reason Mr. Brito's clothing at the time of his arrest establishes probable cause, when considered in combination with other factors, is because it was similar, if not identical, to clothing worn by the robber, and

---

[10] Mr. Brito contends that his "jean-patterned thermal underpants" were "not visible until" officers "pulled down his gray sweatpants." (Brito Aff. ¶ 4.) The Court assumes that this contention is true and that officers indeed could not see Mr. Brito's second layer of clothing before arresting him. This assumption has no effect on the Court's conclusion that officers had probable cause to arrest Mr. Brito.

[11] Certain of the details known to arresting officers—such as the fact that the robber and Mr. Brito wore watches and baseball caps—are so vague that even in combination with other facts, they deserve little to no value when determining probable cause, see *Lefebvre*, 117 F.4th at 476. The Court does not consider these details in reaching its conclusion as to probable cause.

officers could reasonably infer that the pants Mr. Brito was actually wearing could have either been the same article of clothing worn by the robber or clothing of a similar style matching the robber's modus operandi of wearing light-colored, loose-fitting pants capable of being worn over jeans. Mr. Brito also contends that the backpack he wore at the time of his arrest on November 30, 2023 was "dark with a camouflage design, and could not have been readily identified as the one depicted in the surveillance photos." (Brito Aff. ¶ 6.) This alleged inconsistency, as with the exact color of Mr. Brito's pants, is easily reconciled. Arresting officers might have reasonably believed that the backpack Mr. Brito wore at the time of his arrest was the same as the backpack used by the robber because both backpacks were dark and of a similar size and construction, and officers might have reasonably believed that the possession of a dark backpack in combination with other details fit the modus operandi of the robber.

Mr. Brito cites a Tenth Circuit decision, *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), in support of his contention that officers lacked probable cause to effect his arrest. (Mot. at 5.) The Tenth Circuit's decision in *Wood* is not controlling, and it is readily distinguishable. In *Wood*, an officer detained a defendant based on a series of innocuous facts

such as the presence of fast food wrappers and open maps in his vehicle, the defendant's nervousness during the traffic stop, and the defendant's prior narcotics conviction. *See Wood*, 106 F.3d at 946–48. The officer in *Wood* did not use the facts known to him to identify the defendant as the suspect in any outstanding or unsolved crimes, but instead relied directly on innocuous details to support a Fourth Amendment seizure. *See id.* at 946–48.

The government argues that officers also had probable cause to arrest Mr. Brito in connection with the Citibank Robbery based on similarities between the two robberies. (*See* Opp. at 17.) The Court concludes that arresting officers had probable cause to arrest Mr. Brito based on his suspected commission of either or both of the Santander and Citibank Robberies, and thus concludes that his arrest was lawful. *See Jaegly*, 439 F.3d at 154 (in determining "whether probable cause existed to arrest a defendant, . . . it is not relevant whether probable cause existed with respect to each individual charge"); *see also United States v. Zhang*, 165 F.3d 16 (2d Cir. 1998) (unpublished table decision) (finding probable cause to arrest defendant for alien smuggling where he was ultimately convicted of separate offense). As noted in the government's opposition, Mr. Brito does not argue that the Citibank Robbery and the Santander Robbery were committed by two different people. (Opp. at 16.) Moreover, officers had probable

cause to believe the two robberies had been committed by the same suspect due to the many similarities between the offenses: both had been committed by male suspect with a similar build wearing a baseball cap, baggy pants, a medical-style facemask, and carrying a dark backpack in which he claimed to possess a firearm, and who used the threat of that firearm to demand U.S. currency from bank personnel. Further, the suspect in each case changed clothes shortly after each robbery by removing his baggy pants to reveal jeans, changing into a long-sleeve shirt, changing hats, and donning a black balaclava, all before fleeing on a black bicycle with straight handlebars. These similarities establish probable cause to believe the same suspect had committed both robberies, and thus, for reasons described above, and considering the totality of the circumstances known to officers at the time, the similarities therefore establish probable cause to arrest Mr. Brito on November 30, 2023 in connection with both robberies.

Here, arresting officers relied on a series of facts connecting the Santander and Citibank Robberies to Mr. Brito. That some of those facts might have been innocuous when considered in isolation does not disturb this Court's conclusion that the same facts, when considered together, established probable cause that Mr. Brito committed the Santander and Citibank Robberies, and thus established probable cause arrest Mr. Brito on November 30, 2023.

## II.    Warrantless Backpack Search

The initial search of Mr. Brito's backpack was not incidental to his arrest.  The fruits of the search, however, are admissible because the contents of Mr. Brito's backpack would have been inevitably discovered pursuant to a valid inventory search.[12]

### A.  November 30, 2023 Search of Mr. Brito's Backpack Was Not Incidental to His Arrest

To justify arresting officers' warrantless search of Mr. Brito's backpack, the government must show that the search fell within an exception to the warrant requirement. *See United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993).  One such exception, asserted by the government here, is a search incident to a lawful arrest.  *See Chimel v. California*, 395 U.S. 752, 762-63 (1969). "The exception derives from interests in officer safety and

---

[12] Mr. Brito has arguably waived any argument that, if his November 30, 2023 arrest was lawful, the search of his backpack was not. (*See* Jan. 10, 2025 Tr. at 8-9 ("MR. SUNDARAM [defense counsel]: . . . I think the Court's point is well taken that if . . . they had probable cause to arrest him, then in these circumstances, because the backpack was on his back, it does appear to me that that . . . would be a search, a valid search incident to the arrest."); *see id.* at 35-36 ("THE COURT: . . . [D]id the officers, either the NYPD or the FBI, do an inventory of what was taken from the backpack? MR. BODAPATI [government counsel]: Yes, they did, Judge.  THE COURT:  Okay.  So I think we get to the inevitable discovery doctrine, do we not?  Mr. Sundaram?  MR. SUNDARAM:  If they did follow proper inventory procedures, then yes.").)

The Court will nonetheless address Mr. Brito's contentions (i) that the backpack search was not a valid search incident to Mr. Brito's arrest and (ii) that the government has failed to prove that the backpack's contents would have been discovered pursuant to a valid inventory search, contentions discussed largely, if not entirely, in Mr. Brito's February 23, 2025 reply, to which the government responded on February 24, 2025.

evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citations omitted). Thus, the search-incident-to-arrest doctrine "serves two interests: 'protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy.'" *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017) (citation omitted; quoting *Gant*, 556 U.S. at 339; citing *Riley v. California*, 573 U.S. 373, 383–84 (2014)). Setting aside the "automobile context," *Gant*, 556 U.S. at 339, which is inapplicable here, a valid search incident to arrest must be constrained to the arrestee's person and objects within his "immediate control." *United States v. Morillo*, No. 08-cr-676(NGG), 2009 WL 3254431, at *3-4 (E.D.N.Y. Oct. 9, 2009) ("Outside of the automobile context, the Second Circuit has never expanded the scope of a search incident to arrest beyond its two justifications" of "officer safety and evidence preservation."); *id.* at *5 (concluding search of defendant's backpack upon his arrest was not authorized by search-incident-to-arrest doctrine because the backpack was outside of his reach while he was handcuffed, he and the backpack were secured by officers "of larger size," and he had a broken collarbone and no mobility in his right arm); *accord Riley*, 573 U.S. at 383–84 (noting that precedent permitted officers to conduct warrantless search of cigarette case

27

found on arrestee's person incident to his arrest but that such exception was "limited to personal property immediately associated with the person of the arrestee" (alteration adopted; internal quotation marks omitted; quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977); citing *United States v. Robinson*, 414 U.S. 218 (1973))); *Perea*, 986 F.2d at 643 ("upon arrest, the officers may search 'the arrestee's person and the area within his immediate control" (internal quotation marks omitted; quoting *Chimel*, 395 U.S. at 763)).  But if officers have obtained "immediate control" over an arrestee's "personal property," and if "there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence," then "a search of that property is no longer an incident of the arrest." *Chadwick*, 433 U.S. 1, 15, *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

Applying these principles, the Second Circuit reversed a district court's finding that officers properly searched a defendant's briefcase where officers "took it from [the defendant's] possession while he was under arrest and handcuffed." *United States v. Lartey*, 716 F.2d 955, 965 (2d Cir. 1983); *see also United States v. Gorski*, 852 F.2d 692, 694-95 (2d Cir. 1988) (holding that even where "probable cause [at time of arrest] existed for the arrests and the seizure of [a] bag" that officers

had "reason to believe" contained a kilogram of cocaine, "an immediate search of the bag without a warrant would be permitted only if exigent circumstances existed").[13]

---

[13] Several circuits have adopted a more restrictive rule than that described and applied above, specifically finding that "officers can conduct warrantless searches of non-vehicular containers incident to a lawful arrest '*only when* the arrestee is unsecured and within reaching distance of the [container] at the time of the search.'" *United States v. Davis*, 997 F.3d 191, 197 (4th Cir. 2021) (alteration in original; emphasis added; quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)); *see id.* at 197 & n.5 (noting that the Third, Ninth, and Tenth Circuits had reached similar conclusions regarding the significance of *Gant* to non-vehicular searches, with the Fifth and Eighth Circuits declining to reach the question in recent decisions (citations omitted)); *see also United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016) (citing *Gant* for proposition that a search incident to arrest does not extend beyond the arrestee's person and the area within his immediate control); *United States v. Brown*, No. 20-14750, 2021 WL 4955823, at *2 (11th Cir. Oct. 26, 2021) (per curiam) (citing *Gant* for proposition that search-incident-to-arrest doctrine does not apply if "there is no possibility that the arrestee could reach into the area that law enforcement officers seek to search"). *But see United States v. Perez*, 89 F.4th 247, 257–58 (1st Cir. 2023) ("Because *Gant* addresses only searches of automobiles, it says nothing about what distinctions might be tenable when it comes to containers that an arrestee is carrying at the time of the arrest."); *United States v. Cobb*, No. 23-11876, 2024 WL 3874204, at *1–2 (11th Cir. Aug. 20, 2024) (per curiam) (not citing *Gant* at all and upholding search of arrestee's backpack even where we was "handcuffed and surrounded by several officers").

The Second Circuit has not reached the question of whether the Supreme Court's 2009 decision in *Arizona v. Gant* proscribes non-vehicular container searches incident to a lawful arrest unless the arrestee is unsecured and within reaching distance of the container. *See, e.g.*, Pet. for Writ of Cert., *Perez v. United States*, No. 24-577 (U.S. Nov. 21, 2024) (mentioning no Second Circuit cases on either side of this circuit split); Br. in Opp'n, *Perez*, No. 24-577 (U.S. Feb. 26, 2025) (same); Reply Brief for Pet'r., *Perez*, No. 24-577 (U.S. Mar. 12, 2025) (same); *see also Bryant v. Dasilva*, 582 F. App'x 56, 57 (2d Cir. 2014) (stating *Gant* "narrowed law enforcement's ability to search the vehicle of an arrestee under the search-incident-to-arrest exception" without considering whether *Gant* limitation might extend to non-vehicular searches of containers incident to arrest). This Court need not, and does not, reach the question of whether *Gant* proscribes non-vehicular container searches incident to an arrest unless the arrestee is unsecured and within reaching distance of the container at the time of its search. As discussed *infra*, the Court finds that the warrantless search of Mr. Brito's backpack was invalid under the "immediate control" test articulated in *Chimel*, making it unnecessary to assess whether the same search would also be invalid under the more restrictive test articulated in *Gant*.

Here, before arresting officers began their initial search of Mr. Brito's backpack, they removed Mr. Brito's backpack from his possession and restrained Mr. Brito's hands behind his back using handcuffs.[14]  (*See* GX 15 at 00:40.)  Mr. Brito was surrounded by three officers during this initial search.  (*See id.* at 00:20–2:20.)  Before the arrest began, the backpack itself was closed, zipped, and secured behind Mr. Brito with straps worn over both of his shoulders.  (*See id.* at 00:10.)  After a fourth officer appeared (*id.* at 01:56) and Mr. Brito was escorted away from the view of the pole camera (*id.* at 02:35), officers then conducted a more thorough search of the backpack for approximately two more minutes.  (*See id.* at 04:00–6:05.)  On these facts, Mr. Brito's backpack was not within his "immediate control" during his November 30, 2023 arrest and the subsequent search of the backpack in view of the pole camera.  The government has therefore failed to establish that the search of Mr. Brito's backpack was incidental to his arrest.  *See Morillo*, 2009 WL 3254431, at *1, *7 (finding

---

[14] *See United States v. Jones*, 475 F.2d 723, 727–73 (5th Cir. 1973) (noting "if defendant's hands were cuffed in front and he were in close proximity to the suitcase, then the search . . . could probably be justified under *Chimel*" because he "might attempt to lay his hands on a weapon located inside the suitcase" even with multiple FBI agents nearby, but if, on the other hand, "defendant's hands were cuffed behind him in such a manner that he was denied access to the suitcase, then the search could not be upheld under *Chimel* because the suitcase would not be within his immediate control or within an area from which he might gain possession of a weapon or destructible evidence.").

backpack search was not incidental to arrest because backpack was
not in arrestee's immediate control where arrestee was handcuffed
and separated from his backpack, and where officers searched his
backpack around the corner of arresting officers' police car).

The Second Circuit's decision in *United States v. Hayes*,
553 F.2d 824, 826 (2d Cir. 1977), cited by the government, is not
to the contrary. In *Hayes*, the defendant appealed from his
conviction, arguing that the search of his briefcase at the time
of his arrest was illegal "on the basis that there was no probable
cause to arrest him." *Hayes*, 553 F.2d at 826. The Second Circuit
found that officers had probable cause to arrest the defendant for
committing two bank robberies, and on that basis, affirmed the
district court's denial of the defendant's motion to suppress.
*Id.* at 825-26. Thus, the Second Circuit assumed in *Hayes* that if
probable cause existed to arrest the defendant, then evidence
obtained from the search of his briefcase would necessarily be
admissible. Importantly, the defendant in *Hayes* did not contend
that his briefcase was outside of his "immediate control." *See*
*Hayes*, 553 F.2d at 826 (noting defendant's sole basis for his
challenge to the briefcase search was that officers lacked probable
cause). Therefore, *Hayes* does not stand for the proposition that
the briefcase was within the arrestee's "immediate control," as
resolution of that question was assumed and not necessary to the

31

holding of the case. *See United States v. Jones*, 43 F.4th 94, 107 n.9 (2d Cir. 2022) (holding that the Second Circuit's discussion of an issue in *United States v. Gregg*, 463 F.3d 160 (2d Cir. 2006) (per curiam), was dicta where the defendant in *Gregg* "did not even challenge" the issue discussed and "[t]hus, the discussion was not necessary to *Gregg*'s holding"); *id.* at 108 (declining to follow identified dicta in *Gregg*).

Addressing circumstances unlike Mr. Brito's arrest, other decisions in this Circuit, concluding that warrantless searches of closed containers were properly undertaken incident to a defendant's arrest, have relied on *Chimel*'s standard that the object searched was within the defendant's "immediate control" at the time of his arrest, *see United States v. Lam Muk Chiu*, 522 F.2d 330, 332 (2d Cir. 1975) (per curiam) (officers properly searched attaché case incident to arrest where arrestee "made a move toward the attaché case," and therefore it "was clearly within the 'immediate control' of the arrestee" (citing *Chimel*, 395 U.S. at 763)), or have relied on the automobile context, *see, e.g.*, *United States v. Henderson*, 439 F. App'x 56, 57-58 (2d Cir. 2011) (officers could search of arrestee's car and wallet contained therein under warrantless search exception for "a search of a car incident to a lawful arrest"), or have relied on both, *see, e.g.*, *United States v. Currington*, 451 F. Supp. 39, 43-44 & n.6 (S.D.N.Y.

32

1978) (officers properly searched briefcase incident to defendant's arrest where "briefcase was within easy reach of either defendant" as well as located within an automobile), *aff'd*, 607 F.2d 999 (2d Cir. 1979); *United States v. Venizelos*, 495 F. Supp. 1277, 1279-83 (S.D.N.Y. 1980) (officers properly searched handbag that was "readily accessible to the defendant, portable, easily capable of being opened, and within the defendant's grasp" as well as located within an automobile at the time of search).

Thus, neither *Hayes* nor other cases in which the Second Circuit has considered the search of containers incident to a non-vehicular arrest have held that the warrantless search of containers possessed by an arrestee at the time of his arrests is incident to arrest in every case, as the government suggests. (*See* ECF No. 43 at 2 (averring without qualification that "[l]aw enforcement officers can . . . permissibly search containers on a defendant's person, such as backpacks and briefcases, incident to a lawful arrest.").) Rather, the cited cases are entirely consistent with the search-incident-to-arrest exception as described in *Chimel*, permitting officers to search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763.

It follows that the search-incident-to-arrest doctrine does not provide carte blanche to search an arrestee's backpack, but instead authorizes such searches, outside of the automobile context, only where the backpack is within the arrestee's immediate control. As noted, the Court finds that Mr. Brito's backpack was not within his immediate control at any point after officers effected his arrest. Mr. Brito lacked control over his backpack here because three arresting officers removed the backpack—which was closed, zipped, and previously secured behind Mr. Brito with straps worn over both of his shoulders—from his body, restrained his hands behind his back with handcuffs, and surrounded him during the initial search before escorting him out of view of the pole camera and conducting a more thorough search of the backpack. Therefore, the November 30, 2023 search of Mr. Brito's backpack was not incidental to his arrest.

In addition to moving to suppress the contents of his backpack, Mr. Brito seeks to suppress "evidence [of] his inner pants." (Mot. at 6.) Evidence of Mr. Brito's "inner pants" was lawfully obtained incident to his November 30, 2023 arrest. Officer safety concerns justified searching and pulling down Mr. Brito's loose-fitting outer pants to ensure weapons that could threaten the safety of officers were not contained therein. *See, e.g., Gustafson v. Florida*, 414 U.S. 260, 262-65 (1973) (officer

34

was entitled to pat-down "outside and inside" of arrestee's clothing incident to his arrest); *United States v. Edwards*, 415 U.S. 800, 804-06 (1974) (holding police were "entitled to take" arrestee's clothing incident to his arrest); *see also United States v. Gonzalez*, No. 08-cr-363(BSJ), 2009 WL 613201, at *3, *8 (S.D.N.Y. Mar. 4, 2009) (upholding strip search where arrestee was handcuffed, surrounded by four officers, and officers removed arrestee's "baggy, loose-fitting" pants due to concern that he was "hiding a weapon or other contraband on his person"), *aff'd*, 441 F. App'x 31 (2d Cir. 2011). Moreover, Mr. Brito's sole contention in support of his motion to suppress Mr. Brito's "inner pants" is that his arrest was unlawful because officers lacked probable cause. (*See generally* ECF No. 33 (Mot.); ECF No. 42 (Reply).) As discussed above, the Court finds that probable cause existed to effect Mr. Brito's arrest.

> **B.** **Evidence Yielded by the Backpack Search Is Admissible as an Inevitable Discovery Pursuant to an Inventory Search**

Inventory searches are a well-established exception to the rule against warrantless searches. Such searches are "an incidental administrative step following arrest and preceding incarceration." *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983); *see also id.* at 647-48 (holding that search of respondent's shoulder bag was authorized as a valid inventory search); *id.* at

648 ("we hold that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"); *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) ("an inventory search may be 'reasonable' under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause").

A separate exception to the exclusionary rule is the inevitable discovery doctrine. "Under the inevitable discovery doctrine, evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (internal quotation marks omitted; quoting *United States v. Roberts*, 852 F.2d 671, 675–76 (1988)). "[I]llegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006). In this case, there are three necessary contingencies: (1) that Mr. Brito's backpack would be brought to a law enforcement office, (2) that

officers would inventory the backpack before or instead of returning it to a third party, and (3) that officers would have inevitably applied inventory search guidelines to search the bag. *See Morillo*, 2009 WL 3254431, at *11.

The inventory search and inevitable discovery exceptions, although distinct, have been applied together on the theory that challenged evidence would inevitably have been discovered pursuant to a subsequent valid inventory search. *See Mendez*, 315 F.3d at 137–38 ("In some cases, the government successfully invokes the inevitable discovery exception on the basis of inventory search procedures."). Where officers have "legitimate custody of [a defendant's] backpack," they may search it pursuant to "established and standardized procedures" for conducting an inventory search, rendering the fruits of an earlier search by arresting officers near the time of arrest admissible under the inevitable discovery doctrine. *Morillo*, 2009 WL 3254431, at *9–11 (citations omitted); *accord Nix v. Williams*, 467 U.S. 431, 446–47 (1984). To admit evidence under a combined "theory of inevitable discovery in an inventory search," the government must prove three elements by a preponderance:

> (1) that the police had legitimate custody of the vehicle or property being searched, so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted inventory

37

> searches, they did so pursuant to established
> or standardized procedures; and (3) that those
> inventory procedures would have inevitably led
> to the discovery of the challenged evidence.

*Morillo*, 2009 WL 3254431, at *8–11 (quoting *Mendez*, 315 F.3d at 138). As to the first requirement, as noted *supra*, the Court concludes that arresting officers had probable cause to arrest Mr. Brito. Officers therefore had legitimate custody of his personal effects, including his backpack, and an inventory search was therefore justified. *See Perea*, 986 F.2d at 643 ("When a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area." (internal quotation marks omitted; citations omitted)); *see also United States v. Ellis*, No. 19-cr-857(NSR), 2020 WL 6784139, at *4 (S.D.N.Y. Nov. 17, 2020) (finding that defendant's duffel bag was in "legitimate custody" of law enforcement following defendant's lawful arrest).

Turning to the second element, the government has offered evidence that the backpack was searched and that its contents were logged and inventoried in the days following Mr. Brito's arrest in accordance with standardized policies. (*See* GX 16 (FBI inventory of items seized from Mr. Brito titled "collected item log" dated December 4, 2023, including black backpack, airsoft

38

gun, black jacket, belt, gloves, watch, police scanner, balaclava face mask, blue jacket, medical masks, gray and white baseball cap, keys, and bicycle); GX 17 (FBI addendum to items seized from Mr. Brito dated December 5, 2023, including red baseball cap).) The government has also submitted the Joint Task Force Inventory Search Policy, which was in effect from the time of Mr. Brito's November 30, 2023 arrest to the time the contents of his backpack were inventoried on December 4, 2023 and December 5, 2023. (ECF No. 44; GXs 16–17, 21.) The Court finds that the submitted policy constitutes an established and standardized procedure that officers followed in the normal course of an arrestee's booking, and did follow in the normal course of Mr. Brito's booking when searching the contents of his backpack.

This evidence is sufficient to satisfy the government's burden in establishing the second element, which requires "evidence that such [inventory] searches were an invariable, routine procedure in the booking and detention of a suspect at the particular FBI office involved." *Gorski*, 852 F.2d at 696 (remanding for an evidentiary hearing on specific inventory policies of FBI office at issue where the only evidence in the record was that an inventory had been conducted of defendant's bag to "search[] the bag for cocaine and weapons"). The inventory search of the backpack under the submitted policy (GX 21)

establishes that the contents of Mr. Brito's backpack were inventoried pursuant to applicable procedures. *See United States v. Esters*, No. 21-cr-398(EK), 2022 WL 16715891, at *10 (E.D.N.Y. Nov. 4, 2022) (finding firearm found in search of vehicle's glove compartment was obtained pursuant to a valid inventory search where the government submitted written NYPD policies describing established inventory search procedures). Moreover, the Court finds that the submitted policy establishes that when the Joint Task Force officers conducted inventory searches, they did so pursuant to the established and standardized procedures set forth in the submitted policy.

Turning to the third and final element, the Court finds that applicable inventory procedures would have inevitably led to the discovery of the challenged evidence. The Joint Task Force Inventory Search Policy provides that personal property lawfully obtained from an arrestee "should be carefully inventoried and promptly, thoroughly searched by agents." (GX 21, § 19.7.3.) The search "must include both the container and the contents of such container." (*Id.*) Indeed, the Policy provides that "[a]s a general rule, after lawfully taking custody of property, FBI employees *must conduct* a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." (*Id.* § 18.6.12.4.1.D

(emphasis added).)   Thus, it was inevitable that Mr. Brito's backpack would be searched as an "incidental administrative step following arrest," *Lafayette*, 462 U.S. at 644, and inevitable that this search would reveal the challenged contents of Mr. Brito's backpack.  The challenged evidence was recovered from the interior of Mr. Brito's backpack, the search of which was inevitable pursuant to the Joint Task Force's applicable inventory search policy.  (*See, e.g.*, ECF No. 35-1 at 105 (GX 11 at 1) (showing airsoft gun directly beneath unzipped backpack flap).)

Moreover, the Court finds with a high degree of confidence that the contingencies necessary to discover the contested evidence would be resolved in the government's favor. Specifically, the Court finds with a high degree of confidence that: (1) it was inevitable that officers would bring Mr. Brito's backpack to a law enforcement office for booking because there was "no third party at the scene to whom the officers could have given [Mr. Brito's] backpack" (2) officers would inventory the contents of Mr. Brito's backpack before or instead of returning it to a third party; and (3) officers would have applied inventory search guidelines to search Mr. Brito's backpack and its contents.  *See Morillo*, 2009 WL 3254431, at *11.

Therefore, the government has proven by a preponderance that the contents of Mr. Brito's backpack would have inevitably

41

been discovered pursuant to a valid inventory search.   Thus, the contents of the backpack are admissible.

Mr. Brito relies on *United State v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) in support of his contention that the government has failed to meet its burden that the evidence recovered from Mr. Brito's backpack would inevitably have been discovered pursuant to a valid inventory search.   (Reply at 3.) The Second Circuit in *Stokes* reversed a district court's finding that officers inevitably would have discovered a gun in a gym bag hidden under a pair of pants in a defendant's Bronx motel room. *Id.* at 441, 448.   At issue in *Stokes* was whether the gun should be suppressed in light of arresting officers' illegal entry into the defendant's motel room.   *Id.* at 444.   The Circuit held that the district court had erred in failing to consider "[a]ny number of contingencies [that] could have occurred between the time that [arresting officers arrived] and [defendant's] scheduled departure."   *Id.* at 446.   For instance, the gun that the defendant in *Stokes* sought to suppress might not have been discovered because the defendant could have been arrested while stepping outside of his motel room, and the defendant's companion, also a guest registered to the room, could have left the room carrying the gun within the gym bag, with officers having no basis for arresting or searching the companion.   *Id.*   The Second Circuit also found that

42

the district court impermissibly engaged in "inherently speculative" analysis based on an assessment of the actions that might have been taken by third parties such as motel staff. *Id.* at 447. The Second Circuit cautioned district courts not to admit evidence pursuant to the inevitable discovery doctrine unless a reviewing court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Stokes*, 733 F.3d at 444 (quoting *Heath*, 455 F.3d at 60).

The search of Mr. Brito's backpack presents a substantially different scenario than that presented in *Stokes*. Mr. Brito was lawfully arrested, his backpack was transported to a law enforcement office, and his belongings were removed, logged, and inventoried pursuant to established and standardized law enforcement booking procedures. There are no third parties here, as there were in *Stokes*, who might have intervened to either secret away Mr. Brito's backpack before it could be searched or whose likely actions the Court is forced to assess to determine whether the discovery was inevitable. Thus, even though the search of Mr. Brito's backpack at the time of his arrest was not authorized by the search-incident-to-arrest doctrine, the fruits of that search would have inevitably been discovered pursuant to a valid inventory search and are therefore admissible. *See, e.g., United States v.*

43

*Sobers*, 792 F. App'x 904, 905–06 (2d Cir. 2020) (affirming district court's finding that "inventory procedures would have led the police to discovery [the defendant's] gun," which was therefore admissible under the inevitable discovery doctrine); *United States v. Alvarado-Bermudez*, 499 F. Supp. 1070, 1072–74 (E.D.N.Y. 1980) (finding contents of searched bag carried by the defendant when he was arrested were admissible as they would inevitably have been discovered pursuant as a valid inventory search); *see also United States v. Bignon*, 813 F. App'x 34, 36–39 (2d Cir. 2020) (gun found in defendant's backpack was admissible where it was found during valid inventory search of the backpack, which defendant had been carrying at time of his arrest, upon his booking at NYPD precinct).

Mr. Brito's motion to suppress the contents of his backpack is respectfully denied.

## III.    Warrantless Apartment Search

For the reasons set forth below, the Court finds that officers lawfully searched Mr. Brito's former apartment in the Bronx, a separate residence from the Queens residence near which he was arrested.

### A.    Mr. Brito's Apartment Was Lawfully Searched on Consent

A landlord may obtain the authority to consent to the search of his tenant's apartment if such authority is appropriately

delegated to him by the tenant.[15]    To admit evidence on such a theory, the government must prove by a preponderance that the consenting party possessed adequate authority to consent to the search. *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004) (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

Here, the government satisfied its burden of showing adequate authority to consent by a preponderance. The government has provided a summary of a call on December 3, 2023 from Mr. Brito to his mother, Maria, in which Mr. Brito asked Maria "to help him vacating the apartment" and "to remove all his personal belongings." (GX 12; Opp. at 35.)  Mr. Brito's mother responded that she and Mr. Brito's sister were "on their way to do that." (GX 12.)  An unidentified speaker on the recorded call stated that Mr. Brito "needs to surrender the keys' apartment [*sic*] to the owner." (*Id.*)  Mr. Brito's request that his mother help him vacate the apartment is sufficient to show that his mother had actual authority to consent to the search of Mr. Brito's apartment. *See Lewis*, 386 F.3d at 481; *Koch v. Town of Brattleboro*, 287 F.3d 162,

---

[15] To be sure, a landlord does not automatically have authority to consent to the search of his tenant's apartment. *See United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992) (per curiam) ("[T]he investigating officer concluded that because [the landlady] was authorized to enter [the defendant's] apartment when necessary to turn off electrical appliances or lights, she could consent to a search of his apartment. This was . . . a misapprehension of the applicable rule of law [and] the motion to suppress the evidentiary use of the [firearm obtained in the search] should have been granted.").

167 (2d Cir. 2002) (citing *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)). Mr. Brito's mother wrote and signed a letter to Mr. Brito's landlord, Devon Chambers, dated December 9, 2023 in which she stated that she "is giving Devon Chambers permission to vacate all belongings that remain at [Mr. Brito's apartment] and do as needed, to his desire with all ite[ms]." (GX 13.) On December 15, 2023, Mr. Chambers then shared the letter from Mr. Brito's mother with law enforcement officers. (GX 14 at 20.) Thus, Mr. Brito had authorized his mother to vacate his apartment and remove all personal belongings, and Mr. Brito's mother, in turn, had authorized the landlord to vacate all remaining belongings at the apartment and "do as needed, to his desire with all ite[ms]" remaining in the apartment. (GX 13.) The Court therefore finds by a preponderance that that the landlord possessed adequate authority to consent to the search of the apartment. Mr. Brito has failed to rebut the record evidence that he authorized his mother to vacate his apartment, or to rebut that his delegation of authority to his mother was limited in any way that would negate her ability to authorize the landlord to consent to search of Mr. Brito's surrendered and vacated apartment. *See, e.g.*, *Lewis*, 386 F.3d at 481–82 (affirming district court's denial of suppression motion where defendant's mother consented to search and had actual authority to do so).

Mr. Brito contends that his landlord lacked authority to authorize a search of the apartment. (*See* Mot. at 6.) Mr. Brito's affidavit states, in part, that he "never gave [his] landlord permission to let police or anyone else into [his] apartment." (Brito Aff. ¶ 7.) Mr. Brito does not address, however, whether he gave permission to his mother to let anyone into his apartment. As described above, Mr. Brito asked his mother "to help him vacating the apartment" and "to remove all his personal belongings" (GX 12), which establishes that he did, in fact, give his mother permission to let herself and others into his apartment. Thus, officers lawfully searched Mr. Brito's apartment on consent, and the fruits of the apartment search are admissible.

**B.  Mr. Brito's Apartment Was Lawfully Searched Because He Vacated It Prior to the Search**

Even if officers did not obtain an effective consent to search the apartment, Mr. Brito cannot object to the search because he vacated and surrendered it prior to the officers' search and because officers reasonably believed the apartment was vacated. *See United States v. Elliot*, 50 F.3d 180, 186 (2d Cir. 1995) ("A landlord does . . . have authority to consent to a search by police of dwelling units in his building that are not leased." (citations omitted)); *id.* at 187 (finding officers reasonably believed searched unit was unleased and landlord therefore possessed

47

authority to consent to search); *Bruno v. Superintendent, Five Points Corr. Facility*, 639 F. App'x 683, 686 (2d Cir. 2016) (concluding officers reasonably relied on apparent authority of property manager to consent to search of unoccupied motel units).

The Court respectfully denies Mr. Brito's motion to suppress evidence recovered from his former apartment.

## IV.    Suppression Hearing

As noted above, facts pertinent to Mr. Brito's suppression motion, and necessary for its resolution, are not in dispute. *See Poller*, 129 F.4th 172 n.1 (affirming denial of suppression motion without a hearing by relying on facts not in dispute). Even crediting Mr. Brito's version of events for facts that are in dispute, as the Court has done above, Mr. Brito has not established that a hearing is warranted as to the legality of his November 30, 2023 arrest, the subsequent search of his apartment, or of any other challenged search or seizure. *Cf. United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) ("defendant has failed to show that he could challenge the search" even crediting his assertions of fact).

Moreover, the current record permits the Court to find that the Joint Task Force Inventory Search Policy (GX 21), the authenticity of which Mr. Brito does not contest, constitutes an established and standardized procedure that, when applied in the

48

normal course of Mr. Brito's booking, as corroborated by the FBI "collected item logs" (GXs 16-17), would have inevitably revealed the contents of his backpack. *See United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) ("The existence of [a] valid [inventory] procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." (citations omitted; citing *United States v. Wilson*, 938 F.2d 785 (7th Cir. 1991); *United States v. Arango-Correa*, 851 F.2d 54, 59 (2d Cir. 1988)); *Esters*, 2022 WL 16715891, at *10 (finding that defendant's car was searched pursuant to established procedures set out in NYPD Patrol Guide by reference to written inventory search policy).

An evidentiary hearing is therefore not warranted.

### CONCLUSION

For the foregoing reasons, the Court respectfully **DENIES** Mr. Brito's motion to suppress. As previously directed, the parties will appear for a status conference on April 23, 2025, at 11:00 a.m. in Courtroom 6B South.

**SO ORDERED.**

Dated:  March 18, 2025
        Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York